UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| COMMUNITY HEALTH CENTER, INC., : | LEAD DOCKET NO. 3:01CV146(JBA) |
| *Plaintiff* : | |
| : | ALL CASES |
| v. : | |
| : | |
| PATRICIA WILSON-COKER, | |
| COMMISSIONER OF THE STATE OF | |
| CONNECTICUT DEPARTMENT OF | |
| SOCIAL SERVICES, : | |
| *Defendant* : | October 25, 2005 |

**LOCAL RULE 56 (a)(1) STATEMENT**

In accordance with Local Rule 56(a)(1), the defendant, Patricia Wilson-Coker, Commissioner of the State of Connecticut Department of Social Services, hereby submits the following statement of material facts as to which there is no genuine issue to be tried:

1. Medicaid, or Title XIX of the Social Security Act, is a joint federal and state cost-sharing program to finance medical services to indigent people. 42 U.S.C. §1396, et seq.

2. In order to qualify for participation in Medicaid, a state must formulate a State plan and submit it to the Secretary of Health and Human Services (HHS). 42 U.S.C. §1396a(b). The Secretary has delegated the power to review and approve plans and plan amendments to Regional Administrators of the Centers for Medicare and Medicaid Services (CMS), formerly known as the Health Care Financing Administration (HCFA). 42 C.F.R. § 430.15 (b).

3. After a state plan is approved, the federal government then reimburses the state for a percentage of the program's expenses. 42 U.S.C. §1396b(a); 42 C.F.R. § 430.10.

4. Each state plan must provide for payments to "federally-qualified health centers" (FQHCs), which are entities receiving direct grants from the federal government to provide

primary and other health care services to "medically underserved" communities. 42 U.S.C. §§ 254b, 1396a(a)(10)(A), 1396d(a)(2)(C) and 1396d(*l*)(2)(B).

5. Effective for services rendered on and after January 1, 2001, Congress enacted a new reimbursement mechanism for Medicaid funding of FQHCs, utilizing a prospective payment system, which requires states to pay for covered services at an FQHC:

> in an amount (calculated on a per visit basis) that is equal to 100 percent of the average of the costs of the center or clinic of furnishing such services during fiscal years 1999 and 2000 which are reasonable and related to the cost of furnishing such services, or based on such other tests of reasonableness as the Secretary prescribes in regulations under [Medicare]….

42 U.S.C. § 1396a(bb)(2).

6. The law implementing the FQHC prospective payment system required that state plans reflect this new payment system. Id.

7. A directive to the states from HCFA dated January 19, 2001 provided that "States must submit conforming State plan amendments [to the new prospective payment system] before the end of the calendar quarter [March 31, 2001]." Exhibit A, Affidavit of Gary Richter, ¶ 7, Attachment 1.

8. On or about March 29, 2001, the Connecticut Department of Social Services (Department) submitted to HCFA State plan amendment 01-002 to demonstrate compliance with the new federal law regarding FQHC reimbursement. Exhibit A, Affidavit of Gary Richter, ¶ 8, Attachment 2. As an addendum to the State plan amendment, the Department included newly revised policy that sets forth the mechanism by which FQHC rates would be calculated in accordance with the new federal prospective payment system. Exhibit A, Affidavit of Gary Richter, ¶ 9, Attachment 2.

9. On or about April 12, 2001, a revised addendum to State plan amendment 01-002 was submitted to HCFA to reflect technical, non-substantive changes. Exhibit A, Affidavit of Gary Richter, ¶ 10, Attachment 3.

10. On or about June 7, 2001, in response to recommendations contained in a May 21, 2001 letter from HCFA and to other comments received by the Department, the Department submitted another revised addendum to the State plan amendment 01-002. Exhibit A, Affidavit of Gary Richter, ¶ 11, Attachment 4.

11. On June 21, 2001, HCFA approved the Department's State plan amendment as submitted on June 7, 2001. Exhibit A, Affidavit of Gary Richter, ¶ 12, Attachment 5.

12. The State plan amendment approved by HCFA on June 21, 2001 includes a 4200 visit physician productivity screen, by virtue of which the rate for each Connecticut FQHC is determined, in the absence of a waiver, based upon the higher of the actual number of patient visits per physician per year or 4200 patient visits per physician per year. Exhibit A, Affidavit of Gary Richter, ¶ 13, Attachment 4.

13. Connecticut has applied a 4200 visit physician productivity screen to FQHC rate determinations since the enactment of Conn. Gen. Stat. § 17b-245a in 1996. Exhibit A, Affidavit of Gary Richter, ¶ 14. Conn. Gen. Stat. § 17b-245a provides that "in the determination of rates for federally qualified health centers, the Commissioner of Social Services shall apply Medicare productivity standards."

14. Federal Medicare regulations delegate to CMS (formerly HCFA) the power to establish tests of reasonableness, "including…screening guidelines." 42 C.F.R. § 405.2468(c).

15. When HCFA and HHS issued 42 C.F.R. § 405.2468 in 1992, a preamble to the regulation noted that HCFA planned to use a productivity screen of 4200 patient visits per full-time physician.  Exhibit B, 57 Fed. Reg. 24,961, 24,967 (June 12, 1992).

16. CMS uses the 4200 patient visits per full-time physician as a productivity screen for FQHCs.  Exhibit C, Centers for Medicare & Medicaid Services, Rural Health Clinic and Federally Qualified Health Center Manual § 503.

17. In 1978, HCFA established screening guidelines and payments limits for Medicare and Medicaid reimbursement of Rural Health Clinic (RHC) services.  Exhibit D, 43 Fed .Reg. 42787, 42788 (September 21, 1978).  This process included "implement[ing] screening guidelines to assess the reasonableness of the productivity of the clinic's health care staff."  Id.  As to physicians, the guidelines required "[a]t least three visits per hour per physician…."  Id.

18. The productivity guidelines established for RHCs in 1978 were "comparable with those used in connection with reimbursement for similar services furnished by federally funded health centers….Experience has shown them to be fair and workable."  Id.  Federally funded health centers were the predecessors of the FQHCs.  Exhibit E, Affidavit of David Worgo, ¶ 7[1]; Exhibit F, Deposition of David Worgo, p. 85.

19. In 1980, HCFA issued a proposed rule revising the productivity screen for RHCs to 4200 visits per physician per year, which is 2.2 visits per hour per physician.  Exhibit E, Affidavit of David Worgo, ¶ 10; Exhibit G, 45 Fed. Reg. 59734, 59740 (September 10, 1980).  The proposal also allowed for clinics to request a waiver of the productivity guideline on the basis of "reasonable justification."  Exhibit G, 45 Fed. Reg. 59740 (September 10, 1980).

---

[1] This affidavit was originally submitted as Exhibit B of the Defendant's Statement of Material Facts filed in connection with the Defendant's Motion for Summary Judgment dated August 10, 2001 (Docket Entry # 41).  A copy of that affidavit is attached to this Statement as Exhibit E.

4

20. HCFA selected the guidelines proposed in 1980 "for several reasons." Exhibit G, Fed. Reg. 59740 (September 10, 1980). One such reason was that most RHCs also received grants from the Bureau of Community Health Services (BCHS) and were thereby already subject to BCHS guidelines that were the same as those proposed by HCFA. Id. Another reason expressly stated by HCFA was that "we believe the proposed guidelines are reasonable because they are very close to our estimates of the actual average productivity of clinics now reporting their costs and utilization to HCFA." Id. HCFA further stated that the proposed guidelines were not incorporated into the proposed rule "because they would be subject to change from time to time." Id. However, HCFA noted, "we wish to obtain public comment on their use. We will consider the comments received, and publish final guidelines in the federal register. We will also publish a notice of any change in those guidelines." Id.

21. In a Final Notice issued in the Federal Register on December 1, 1982, the revised productivity screens were established for RHCs. Exhibit E, Affidavit of David Worgo, ¶ 13; Exhibit H, 47 Fed. Reg. 54163, 54165 (December 1, 1982). The physician productivity screen established in the Final Notice was 4200 visits per year, with a provision authorizing a waiver "when the clinic can reasonably justify its inability to comply." Exhibit H, 47 Fed. Reg. 54166 (December 1, 1982).

22. In addressing why these productivity screening guidelines were selected, HCFA indicated that, in addition to the fact that most RHCs received grants from BCHS, "[o]ur estimates of the actual productivity of clinics now reporting their costs and utilization to HCFA show that physicians…have average FTE productivity substantially greater than the minimum guidelines." Id.

5

23. In responding to a comment that the productivity screens should permit a lower standard for a newly added practitioner, HCFA stated that "[w]e did not use this approach because our analysis disclosed that the effect of this guideline on clinic rates would be of little benefit to all but the smallest clinics." Id.

24. In responding to a comment that the guidelines were too liberal, HCFA stated that "[t]he levels of productivity specified for RHCs reflect our assessment of reasonable minimum performance levels, based on data submitted to us by RHCs. This assessment is also supported by the experience of clinics receiving grants under the PHS [Public Health Service] program, using similar guidelines." Id. at 54166-54167.

25. Prior to issuing the 1982 Final Notice establishing the revised physician productivity screen of 4200 visits per year, HCFA conducted an analysis of the productivity screens, utilizing RHC data, and made a specific determination that those screens were reasonable and effective. Exhibit E, Affidavit of David Worgo, ¶ 11; Exhibit F, Deposition of David Worgo, pp. 91-93. This analysis is reflected in statements made by HCFA relative to the 1980 proposed rule and the 1982 Final Notice. Exhibit G, 45 Fed. Reg. 59740 (September 10, 1980); Exhibit H, 47 Fed. Reg. 54166-54167 (December 1, 1982).

26. In 1990, Congress amended the Social Security Act by adding "Federally qualified health center services" to the definition of "medical and other health services" offered under the Medicare program. 42 U.S.C. § 1395x (s)(2)(E). Although there are certain differences between FQHCs and RHCs, the FQHC services and RHC services provided by physicians, physician assistants, nurse practitioners, qualified clinical psychologists, clinical social workers and certain visiting nurse services are virtually identical. Exhibit B, 57 Fed. Reg. 24961, 24962 (June 12, 1992).

27. In 1992, HCFA issued a "final rule with comment period" regarding payment under the Medicare program for a "new category of facility known as a Federally qualified health center." Exhibit E, Affidavit of David Worgo, ¶ 14; Exhibit B, 57 Fed. Reg. 24961 (June 12, 1992). The effective date of the provisions of the final rule with comment period was June 12, 1992. Id.

28. In its final rule with comment period, HCFA states that it is adopting the RHC payment methodology for FQHCs, including productivity screening guidelines, and specifically including the 4200 visit standard for physicians. Exhibit E, Affidavit of David Worgo, ¶ 15; Exhibit B, 57 Fed. Reg. 24967 (June 12, 1992).

29. In discussing productivity screening guidelines, HCFA noted in 1992 that recent changes in federal law allowed for payment to clinical psychologists and clinical social workers. Exhibit B, 57 Fed. Reg. 24969 (June 12, 1992). HCFA went on to indicate that it had considered applying the same productivity screens used for physician assistants and nurse practitioners to clinical psychologists and clinical social workers, "but because we have not had sufficient experience with measuring appropriate productivity levels, we will not apply these screening guidelines at this time….We intend to look at the productivity of the clinical psychologist and clinical social worker in the future to determine what productivity screening guidelines can be appropriately applied to these practitioners." Id.

30. HCFA's 1992 final rule with comment period provided that "[w]ritten comments will be considered if we receive them at the appropriate address, as provided below, no later than 5 p.m. on August 11, 1992." Exhibit B, 57 Fed. Reg. 24961-24962 (June 12, 1992).

31. Responses to comments to HCFA's 1992 final rule with comment period, including responses to comments regarding the productivity standards, were written during the summer and fall of 1992. Exhibit I, Deposition of Craig Dobyski, pp. 9-10.

32. In 1993, HCFA became aware that the Health Resources and Services Administration (HRSA) planned to stop using productivity guidelines, including the 4200 visit per physician guideline, for its grant-funded health centers in 1994. Exhibit E, Affidavit of David Worgo, ¶ 17; Exhibit F, Deposition of David Worgo, pp. 89-91. HCFA learned of HRSA's intentions by means of a fax transmittal sent to HCFA by HRSA in 1993. Exhibit F, Deposition of David Worgo, p. 89.

33. HCFA continued to use productivity guidelines for RHCs and FQHCs after learning that HRSA had decided to discontinue using the guidelines. Exhibit E, Affidavit of David Worgo, ¶ 18; Exhibit F, Deposition of David Worgo, pp. 91-93. HCFA continued to use the productivity guidelines because: (1) HCFA had made a specific determination that the screens were reasonable and effective, based on data from the clinics; (2) clinics or centers could request a waiver of the screens; and (3) there were no reported waiver requests by FQHCs in the previous several years. Id.

34. CMS (formerly HCFA) is not required to accept positions taken by HRSA on issues that are of mutual interest. Exhibit J, Deposition of Rhonda Rhodes, pp. 35-36.

35. In 1996, HCFA published its Final Rule regarding payment under the Medicare program for FQHCs. Exhibit K, 61 Fed. Reg. 14640 (April 3, 1996). HCFA's 1996 Final Rule included the agency's responses that had been written during the summer and fall of 1992 to comments that had been received by August 11, 1992. Exhibit K, 61 Fed. Reg. 14640-14656; Exhibit I, Deposition of Craig Dobyski, pp. 9-10.

36. If an FQHC did not meet the 4200 visit physician productivity standard in either 1999 or 2000, it had the opportunity to apply for a waiver of the screening guideline and to present reasonable justification for why screen was not met. Exhibit A, Affidavit of Gary Richter, ¶ 15, Attachment 4.

37. The plaintiff Community Health Center, Inc. did not apply for a waiver of the 4200 visit physician productivity standard with respect to its January 1, 2001 prospective rate. Exhibit A, Affidavit of Gary Richter, ¶ 16. Four of the plaintiff FQHCs in the consolidated case of *Connecticut Primary Care Association, Inc. v. Wilson-Coker* (Southwest Community Health Center, Inc., Bridgeport Community Health Center, Inc., Charter Oak Health Center, Inc. and Community Health Services, Inc.) did apply for a waiver of the productivity standard with respect to their January 1, 2001 prospective rates. Exhibit A, Affidavit of Gary Richter, ¶ 17. Final administrative decisions on those waiver applications are currently pending. Id.

       DEFENDANT
       PATRICIA WILSON-COKER,
       COMMISSIONER OF THE STATE OF
       CONNECTICUT DEPARTMENT OF
       SOCIAL SERVICES


       RICHARD BLUMENTHAL
       ATTORNEY GENERAL


       Richard J. Lynch
       Assistant Attorney General


BY: /s/_____
       Thomas J. Ring
       Assistant Attorney General
       Federal Bar No. ct08293
       55 Elm Street
       P.O. Box 120
       Hartford, CT  06141-0120
       Tel: (860) 808-5210
       Fax: (860) 808-5385
       Thomas.Ring@po.state.ct.us

## **CERTIFICATION**

I hereby certify that a copy of the foregoing Local Rule 56 (a)(1) Statement was mailed in accordance with Rule 5(b) of the Federal Rules of Civil Procedure on this 25th day of October, 2005, first class postage prepaid to:

Attorney Richard R. Brown
Brown, Paindiris & Scott
100 Pearl Street
Hartford, CT 06103

Attorney James L. Feldesman
Feldesman, Tucker, Leifer, Eidell and Bank
2001 L Street, N.W.
Washington, D.C. 20036

Lauren M. Nash, Assistant United States Attorney
P.O. Box 1824
New Haven, CT 06508

Attorney Marilyn B. Fagelson
Murtha Cullina LLP
2 Whitney Avenue
P.O. Box 704
New Haven, CT 06503-0704

/s/_____
Thomas J. Ring
Assistant Attorney General