UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| COMMUNITY HEALTH CENTER, INC., et al., ) <br> ) <br> *Plaintiffs*, ) <br> ) <br> v. ) <br> ) <br> ) <br> PATRICIA WILSON-COKER, J.D., M.S.W., ) <br> COMMISSIONER OF THE ) <br> STATE OF CONNECTICUT ) <br> DEPARTMENT OF SOCIAL SERVICES ) <br> ) <br> *Defendant.* ) <br> _____) | No. 3:01CV146 (JBA) |

### LOCAL RULE 9(c)1 STATEMENT

### INTRODUCTION

Pursuant to Local Rule 9(c)1 and Rule 56 of the Federal Rules of Civil Procedure, Plaintiff hereby submits this statement of material facts as to which there is no genuine issue. When submitting their initial summary judgment briefs in 2001, the parties were unable to agree on a stipulated statement of undisputed facts. At that time, counsel for the parties conferred regarding their respective statements, and the differences that prevented a stipulation pertained to stylistic approach (*e.g.*, whether regulatory historical facts should be included in the statement), and not to *any* factual issue relevant to decision of this case. It remains plaintiffs' position, and we believe the position of defendant as well, that there are no outstanding material facts in dispute.

1

## STATEMENT

1.  Pursuant to Conn. Agencies Regs. § 17b-262-661, defendant's department, the Department of Social Services ("DSS"), has imposed an "Imputed Primary Health Services Visits" adjustment that has the effect of reducing the Federally-qualified health center ("FQHC") costs DSS will treat as allowable when calculating the FQHCs' per-visit rate under the new FQHC payment legislation that took effect January 1, 2001, which is codified at 42 U.S.C. § 1396a(aa). Exhibit A, JA 61-62, Affidavit of Gary Richter at ¶ 14 - 20.

2.  The way the Imputed Primary Health Services Visits adjustment works is as follows: assuming an FQHC had three full-time physicians with a total of 12,000 visits for the year (an average of 4,000 visits per physician), the FQHC's actual cost for the physicians would be multiplied by 4,000 divided by 4,200, or 95.24 percent. The result of that computation would be the physician costs DSS would deem to be "allowable" when calculating the per-visit rate under 42 U.S.C. § 1396a(aa). *Id.* at JA 84-85.

3.  DSS first implemented the 4,200-visit Imputed Primary Health Services Visits adjustment described above in ¶¶ 1 and 2 in the rate year starting April 1, 1996. However, it was not until 2001 that the adjustment was reflected in State regulations as well as in the State of Connecticut's Medicaid plan. Conn. Agencies Regs. § 17-134d-70; JA 81-87. Connecticut's State Plan in effect prior to January 1, 2001 contained a screen of 3,400 physician visits per year.

4.  When the State first implemented the 4,200-visit Imputed Primary Health Services Visits adjustment in 1996, the adjustment was made automatically by the State. In the State's current regulations on the adjustment (§ 17b-262-661), an FQHC subject to the

adjustment may appeal to DSS for a waiver. Conn Agencies Regs. § 17b-262-665(d); Exhibit A, JA 86.

5.  The Region I regional office of the Health Care Financing Administration (recently renamed the Centers for Medicare and Medicaid Services ("CMS")) on June 21, 2001, approved the State of Connecticut's amendment to its Medicaid State plan that were intended to reflect the requirements of 42 U.S.C. § 1396a(aa). Provisions of that amendment include the Imputed Primary Health Services Visits adjustment described above in ¶¶ 1-4 and reflected in Conn. Agencies Regs. § 17b-262-661. Exhibit A, JA 88 - 91.

6.  In submitting the State plan amendments described in the preceding paragraph, the State did not provide the Regional Office with any independent study or analysis to justify its use of the Imputed Primary Health Services Visits adjustment. JA 63, Affidavit of Gary Richter at ¶ 28; JA 88 - 91.

7.  Prior to implementing the Imputed Primary Health Services Visits adjustment of 4,200 physician visits, DSS performed no independent study or analysis to justify the use of that adjustment. *Id.*

8.  DSS is unaware of any study or analysis that was performed by any other State agency or any branch of Connecticut government to justify the use of the Imputed Primary Health Services Visits adjustment of 4,200 physician visits. JA 63, Answer, ¶ 13.

9.  Richard Pecorella was the CMS regional official staff person assigned principal FQHC responsibility. Exhibit B, Pecorella Depo. at 34:5 - 17.

3

10. According to Mr. Pecorella, in implementing the new PPS system for FQHC payments,

> Mr. Pecorella: [t]he basic [principle] that CMS was operating on, was that the state will use the methodology it had in place in 1999 and 2000, which [are] the years you use to calculate your base year. You use whatever your methodology was then. That's what you use. They [referring to Connecticut] had the 4200 in there. That was their definition of reasonableness.
>
> Mr. Feldesman: Where did that premise come from?
>
> Mr. Pecorella: My central office. That was our guidance.

Exhibit B, Pecorella Depo. at 20-21.

11. On September 12, 2001, CMS's Acting Director of its Families and Children's Health Programs Group issued a memorandum to Associate Regional Administrators attaching "guidance in the form of Questions and Answers (Qs and As) on the new Medicaid PPS" program." Q and A 16 provides that:

> Question: The legislation states that the per visit rate shall be an amount that is equal to 100 percent of the average of the costs of the center/clinic of furnishing such services during fiscal year 1999 and fiscal year 2000 which are reasonable. What are the tests of reasonableness?
>
> Answer: The BIPA legislation requires the states to use tests of reasonableness in effect in fiscal year 1999 and fiscal year 2000 in establishing a PPS rate or, as prescribed in regulations under section 1833(a)(3) of the Social Security Act. This section of the statute allows for the application of caps and productivity screens.

Exhibit C, September 12, 2001 CMS Memorandum regarding PPS.

4

12. Mr. Pecorella's official statement of that principle and why it resulted in the Boston office's approval of the productivity screen is contained in a letter he wrote for the head of the head of that office, Ronald Preston (letter at Exhibit A, JA 78-80). *See* Exhibit B, Pecorella Depo. at 35-36, 43, 48.

13. The Pecorella/Preston letter had been written as a response to concerns expressed to the Boston office by an association of Connecticut FQHCs over how Connecticut was implementing the FQHC PPS program. Regarding the principle, the letter stated that:

> While you are correct that the Bureau of Primary Health Care no longer uses productivity screens in the grant approval process, [DSS] is free to use these screens in establishing a Medicaid payment methodology. HCFA believes that Section 702 of BIPA requires [DSS] to use the methodology in place during fiscal years 1999 and 2000 in calculating the base year visit rate (January 1, 2001 to September 30, 2001). State statute 17b-245a requires [DSS] to use the Medicare productivity screens in establishing health center visit rates. This law has been in place since 1996. HCFA published the current Medicare screens in Section 503 of the Rural Health Clinic and Federally Qualified Health Center Manual (HCFA Pub. 27), effective in May 1997. Therefore, since 1997 [DSS], following its state law, has been using the screens in question. [DSS] had not updated its regulation nor the Medicaid State Plan to reflect the State statute cited above until the submission of the subject plan amendment. Because state law supercedes [sic] state regulation, [DSS] correctly used the Medicare productivity screens. With the submission of this plan amendment, [DSS] has brought its regulation into agreement with State law and the State Plan into compliance with its practice.

Exhibit A, JA 78-80.

14. CMS was concerned only with ensuring that the State's payment methodology was in compliance with the terms of the State plan amendment. *Id.* at 36:13 – 24. Mr.

5

Pecorella's office was concerned with bringing the State into compliance with its State plan by amending it to reflect the 4200 screen. When reviewing Connecticut's State plan amendment, CMS was focused on addressing process and the mistakes made. There was no examination of the issue of reasonableness of the 4200 screen itself. *Id.*

Respectfully submitted,

Richard R. Brown
Fed. Bar No. 00009
Brown, Paindiris & Scott
100 Pearl Street
Hartford, CT 06103
(860)522-3343 (telephone)
(860)522-2490 (facsimile)

and

_____
James L. Feldesman
Kathy S. Ghiladi
Feldesman Tucker Leifer Fidell LLP
2001 L Street, N.W., Second Floor
Washington, D.C. 20036
(202) 466-8960 (telephone)
(202) 293-8103 (facsimile)

*Counsel for Plaintiffs*