UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

Connecticut Primary Care          :
Association, Inc. et al.,         :
      Plaintiffs.                 :
                                  :
v.                                :     Case No. 3:02cv626 (JBA)
                                  :
Patricia Wilson-Coker, Commissioner:
of the State of Connecticut       :
Department of Social Services,    :
      Defendant.                  :

RULING ON MOTIONS FOR SUMMARY JUDGMENT [Docs. ## 42, 45]

This action was commenced to challenge the legality of a
4,200 physician visit productivity screen imposed by defendant
Commissioner of Connecticut's Department of Social Services
("DSS") which reduces the amount of DSS reimbursement paid to
plaintiffs for the Medicaid services they provide.  This action
was initially consolidated with a related action, Community
Health Center, Inc. v. Wilson-Coker 01cv146 (JBA), the Court
ruled on the parties' cross-motions for summary judgment, see
Community Health Ctr., Inc. v. Wilson-Coker, 175 F. Supp. 2d 332
(D. Conn. 2001), the Court's ruling was appealed, and the Second
Circuit reversed and remanded, see Community Health Ctr., Inc. v.
Wilson-Coker, 311 F.3d 132 (2d Cir. 2002).  The 01cv146 action
now having been settled, this case has been reopened for summary
judgment proceedings post-remand.  For the reasons that follow,
plaintiff's Motion for Summary Judgment [Doc. # 45] will be
granted and defendant's Motion [Doc. # 42] will be denied.

1

## I.    Background

Plaintiffs are all federally-qualified health centers ("FQHCs") that receive grants from the Federal Government to provide health care services to medically underserved communities and can also charge for providing Medicare and/or Medicaid services.[1]  Federal law requires that state Medicaid plans cover services rendered by FQHCs, and accordingly any state that wishes to participate in Medicaid must submit a plan for federal approval providing how it will administer and process its Medicaid reimbursements to FQHCs.  The Secretary of the United States Department of Health and Human Services ("HSS") has delegated its authority to review and approve such plans to regional Centers for Medicare and Medicaid Services ("CMS").

In December 2000, Congress passed the Benefits Improvement and Protection Act of 2000 ("BIPA"), Pub. L. No. 106-554 (Dec. 21, 2000), which reconfigured FQHC reimbursement with a prospective payment system ("PPS"), providing for covered services rendered at FQHCs:

> in an amount (calculated on a per visit basis) that is
> equal to 100 percent of the average of the costs of the

---

[1] "Medicare is generally designed to provide health insurance coverage to the elderly and disabled . . . and is administered, for the most part, by intermediaries, who must apply a uniform set of standards established by federal law. . . . Medicaid, on the other hand, is designed to partially compensate States for the costs of providing health care to needy persons of modest income."  Community Health Ctr. v. Wilson-Coker, 311 F.3d 132, 134 (2d Cir. 2002).

2

center or clinic of furnishing such services during
fiscal years 1999 and 2000 which are reasonable and
related to the cost of furnishing such services, or
based on such other tests of reasonableness as the
Secretary prescribes in regulations under [Medicare],
or, in the case of services to which such regulations
do not apply, the same methodology used under
[Medicare], adjusted to take into account any increase
or decrease in the scope of such services furnished by
the center or clinic during fiscal year 2001.

42 U.S.C. § 1396a(bb)(2).[2]  This statutory provision required

states to amend their plans to reflect this reimbursement system,

and on January 19, 2001 CMS's predecessor, the Health Care

Financing Administration ("HCFA"), announced that "States must

submit conforming State plan amendments before the end of the

calendar quarter [March 31, 2001]."  Richter Aff. [Doc. # 44, Ex.

A] ¶ 7, Attachment 1.

   Plaintiffs now challenge a provision in the Connecticut

Medicaid plan (the "Plan") ultimately approved by HCFA/CMS on

June 21, 2001, which imposes on FQHCs a productivity screen of

4,200 patient visits per physician per year, according to which

DSS's payments to FQHCs may be reduced for facilities whose

physicians have fewer than 4,200 patient visits per year.[3]

Connecticut has applied this 4,200 visit productivity screen to

_____

   [2] Payment to FQHCs for services rendered post-January 1,
2001 is thus now keyed to the amounts the FQHC received in
previous years, subject to certain increases and adjustments.
See 42 U.S.C. § 1396a(bb) (1)-(3).

   [3] Thus, for example, if an FQHC physician had only 3,800
patient visits in a year, DSS would only reimburse that FQHC
90.4% of the FQHC's costs of providing those visits.

3

FQHC Medicaid payments since the enactment of Conn. Gen. Stat. §
17b-245a in 1996, but did not amend its Plan and submit it for
approval until 2001.  Both parties agree that federal Medicare
regulations delegated to HCFA/CMS the power to establish
reasonableness standards, "includ[ing] . . . screening
guidelines."  42 C.F.R. § 405.2468(c).  When HCFA and HHS issued
such regulations in 1992, "a preamble to the rule noted that HCFA
planned to use a productivity screen of 4200 patient-visits per
full-time physician."  311 F.3d at 132 (citing 57 Fed. Reg.
24,961, 24,967 (June 12, 1992)).

    The Second Circuit directed this Court to consider on remand
"whether Connecticut's 4200 productivity screen passes statutory
muster on its own terms" and, in so doing, to determine "what
role CMS's approval of the Connecticut State Plan should play in
assessing the reasonableness of the 4200 productivity screen. . .
. The district court . . . should consider whether to defer to
the implicit judgment of the Secretary that a state plan complies
with federal law."  The Circuit noted that this Court "should
bear in mind the principles of deference [outlined in its
opinion]," keeping in mind that "[d]eference, . . . even at its
highest levels, is not a 'rubber stamp,'" and could "consider the
materials submitted by Connecticut in support of its plan, and
the factors considered by CMS in evaluating those materials."
311 F.3d at 140.

Thus, the Court's task in considering the pending motions for summary judgment, is to determine whether it should accord deference to CMS's implicit finding that Connecticut's 4,200 productivity screen complies with the federal Medicaid statute.

## II.  Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Where, as here, the parties agree as to the material facts, summary judgment is appropriate.  See Leebaert v. Harrington, 332 F.3d 134, 139 (2d Cir. 2003).

## III. Discussion

Defendant contends that CMS's approval of Connecticut's Plan, including the 4,200 productivity screen, is entitled to mandatory deference under Chevron U.S.A. v. Natural Resources Defense Council, 467 U.S. 837 1984), because Congress delegated to the HHS Secretary, who in turn delegated to CMS, the authority to make rules carrying the force of law, including approval of State Medicaid plans, and the interpretation that the Connecticut Plan was in compliance with the Medicaid statute implicit in CMS's approval of the Plan was rendered in exercise of that

authority.  Defendant argues that CMS's approval of the Plan was neither arbitrary and capricious nor manifestly contrary to the federal Medicaid statute because, <u>inter alia</u>, CMS has articulated a rational connection between the facts found and the choice made to approve Connecticut's Plan.

Plaintiffs claim that CMS's approval of Connecticut's Plan warrants no deference because <u>Chevron</u> applies only where a statute is silent or ambiguous with respect to a particular issue, and in this case it was Congress' intent that HHS, CMS, and states would use data on actual costs incurred by FQHCs, and neither CMS's decision to use a 4,200 productivity screen for Medicare, nor its approval of Connecticut's use of the screen for Medicaid, not Connecticut's own decision to adopt the screen, considered actual costs, and therefore the actions by those agencies should not be considered interpretations of the federal Medicaid statute entitled to deference.

## A.    Deference

<u>Chevron</u> provides that "[o]n review of an agency's construction of a statute that it administers, a court must first determine whether the plain language of the statute speaks directly to the issue."  <u>Himes v. Shalala</u>, 999 F.2d 684, 688 (2d Cir. 1993) (citing <u>Chevron</u>, 467 U.S. at 842).  "If Congress has directly addressed the matter, the court as well as the agency must give effect to congressional intent."  <u>Id</u>. (citing <u>Chevron</u>,

467 U.S. at 842-43).  However, if Congress has not spoken directly on the issue, "then the court must determine whether the agency's construction of the statute was a permissible one."  <u>Id</u>. (citing <u>Chevron</u>, 467 U.S. at 843).

The Supreme Court has held that "administrative implementation of a particular statutory provision qualifies for <u>Chevron</u> deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." <u>United States v. Mead</u>, 533 U.S. 218, 226 (2001).  Here, Congress "expressly conferred to the [HHS] Secretary authority to review and approve state Medicaid plans as a condition to disbursing federal Medicaid payments."  <u>Pharmaceutical Research & Manufacturers of America v. Thompson</u> ("<u>PHRMA</u>"), 362 F.3d 817, 822 (D.C. Cir. 2004) (citing 42 U.S.C. § 1396).  And, as the Second Circuit observed on appeal, the Secretary "reviews each plan to assure that it complies with a long list of federal statutory and regulatory requirements."  311 F.3d at 134 (citing 42 U.S.C. §§ 1396, 1396a; 42 C.F.R. § 430.15(a)); <u>accord</u> <u>PHRMA</u>, 362 F.3d at 822 ("In carrying out [the duty of approving state Medicaid plans], the Secretary is charged with ensuring that each state plan complies with a vast network of specific statutory requirements.").  The Secretary has delegated this authority to

7

CMS Regional Administrators.  42 C.F.R. § 430.15(b).

Thus, courts have held that approval or disapproval of state Medicaid plans constitutes agency interpretation made in the exercise of statutorily-conferred authority and with the force of law justifying application of Chevron.  See Perry v. Dowling, 95 F.3d 231, 236-37 (2d Cir. 1996) ("In these circumstances, in which the state has received prior federal-agency approval to implement its [Medicaid] plan, the federal agency expressly concurs in the state's interpretation of the statute, and the interpretation is a permissible construction of the statute, that interpretation warrants deference.") (citing Chevron, 467 U.S. at 844-45).[4]

---

[4] Accord Harris v. Olszewski, 442 F.3d 456, 467 (6th Cir. 2006) (in certifying that Michigan plan amendment complied with statutory and regulatory requirements, HHS "was exercising Congress's express delegation of specific interpretative authority, . . . and accordingly the agency's approval of the state plan amendment [was] entitled to Chevron deference"); Alaska Dep't of Health & Social Servs. v. Ctrs. for Medicare & Medicaid Servs., 424 F.3d 931, 938-39 (9th Cir. 2005) (Chevron framework for determining level of deference to be accorded to an agency interpretation of a statute applied to CMS's interpretation of Medicaid statute implicit in CMS's disapproval of state plan amendment); PHRMA, 362 F.3d at 821-22 ("Through . . . express delegation of specific interpretative authority [in the form of authority to review and approve state Medicaid plans], . . . the Congress manifested its intent that the [HHS] Secretary's determinations, based on interpretation of the relevant statutory provisions, should have the force of law" and "[t]he Secretary's interpretations of the Medicaid Act are therefore entitled to Chevron deference."); Texas v. United States Dep't of Health & Human Servs., 61 F.3d 438, 440 (5th Cir. 1995) (Chevron framework applies to CMS predecessor HCFA's rejection of amendment to Texas Medicaid plan, and court would defer to HCFA's interpretation assuming rejection of the proposed

In Perry, the Second Circuit considered the policy of the New York State Department of Social Services in "requiring poverty level pregnant women who received medical assistance under [Medicaid] to cooperate in recouping the cost of the medical assistance from the father of the child upon recertification for continued Medicaid coverage." 95 F.3d at 234-35. The Perry court observed that while a state agency's interpretation of a federal statute is entitled no deference, and "although in this case the initial interpretation of the paternity cooperation exemption was that of DSS, a state agency," through HHS's approval of New York's policy, "HHS has expressly agreed with DSS's interpretation." Id. at 236. The court thus concluded that "[i]n these circumstances, in which the state has received prior federal-agency approval to implement its plan, the federal agency expressly concurs in the state's interpretation of the statute, and the interpretation is a permissible construction of the statute, that interpretation warrants deference." Id. at

---

amendment was based upon a permissible construction of the Medicaid statute).

As these courts have concluded, that approval of a state's Medicaid plan is not "subjected to the formal administrative procedure," does not undermine the applicability of Chevron. See Harris, 442 F.3d at 470 ("[T]he Supreme Court has already rejected the argument that when an interpretation was not made after a formal adjudication or notice-and-comment rulemaking, it does not warrant Chevron-style deference. . . . In the end, while a formal process is one signal that an agency deserves Chevron deference, it is not the only one.").

237 (citing <u>Chevron</u>, 467 U.S. at 844-45).[5]

Thus, in accordance with <u>Perry</u> and the courts in other Circuits that have found that HHS's approval of state Medicaid plans and policies constitutes an agency interpretation with the force of law warranting <u>Chevron</u> deference, the Court will apply the two-prong <u>Chevron</u> framework to determine whether to defer to CMS's approval of Connecticut's 4,200 productivity screen as passing statutory muster.  In so analyzing CMS's decision, the Court bears in mind the Second Circuit's caution that <u>Chevron</u> is not a "rubber stamp" on agency action, 311 F.3d at 140, as even under <u>Chevron</u>, "[r]eviewing courts are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute."  <u>NLRB v. Brown</u>, 380 U.S. 278, 291 (1965).

**B.   Analysis**

As noted above, upon determination that the <u>Chevron</u> framework is applicable to an agency's decision, the first step is to determine whether the plain language of the statute "speaks directly" to the issue addressed by the agency.

---

[5]   <u>Accord</u> <u>Carroll v. Debuono</u>, 998 F. Supp. 190, 194 (N.D.N.Y. 1998) (relying on <u>Perry</u> and concluding that "the proper standard review is the <u>Chevron</u> two-prong standard of substantial deference" where the case "challenge[d] a state agency regulation regarding New York's Medicaid program that has been approved by a federal agency").

The relevant section of the Medicaid statute requires that each state's plan must provide that it will pay for covered services rendered at an FQHC:

> in an amount (calculated on a per visit basis) that is equal to 100 percent of the average costs of the center or clinic of furnishing such services during fiscal years 1999 and 2000 which are reasonable and related to the cost of furnishing such services, or based on such other tests of reasonableness as the Secretary prescribes in regulations under [Medicare], or, in the case of services to which such regulations do not apply, the same methodology used under [Medicaid] adjusted to take into account any increase or decrease in the scope of such services furnished by the center or clinic during fiscal year 2001.

42 U.S.C. § 1396a(bb)(2).  On appeal, the Second Circuit noted that "it is clear from the face of the statute that 'reasonable and related' encompasses more than simply the Secretary's Medicare regulations.  The phrase, 'or based on other such tests,' signals a plain intention to differentiate between two alternatives."  311 F.3d at 136.  The Circuit noted that "[a]mbiguity enters . . . when we attempt to determine where we should turn for alternative definitions of 'reasonable and related.'" Id. at 137.  The Circuit thus determined that the statute does not directly speak on the possible definitions of "reasonable and related," which defendant has determined, with CMS's approval, includes the 4,200 productivity screen, and the Circuit thus deferred to CMS's interpretation that in the absence of contrary regulations, states have broad authority to define reasonable costs for purposes of their Medicaid payment to

11

FQHCs." Id. at 137-39.  Therefore, in accordance with the
Circuit's construction of § 1396a(bb)(2), the Court finds that
Congress has not spoken directly on the issue of the
appropriateness of using productivity screens to define
"reasonable and related" costs.

Because the Court concludes that the statute does not
specifically address the appropriateness of Connecticut's 4,200
productivity screen, it must next determine whether CMS's
implicit determination that the screen complies with the federal
Medicaid statute is a permissible construction of that statute.
In determining whether its construction is permissible, this
Court "need not find that it would have interpreted the statute
in the same manner. . . . Rather, [it] must uphold the agency's
interpretation unless it is an impermissible construction of the
statute." Himes, 999 F.2d at 689.  "[A] permissible construction
of the statute is one that reflects a plausible construction of
the plain language of the statute and does not otherwise conflict
with Congress' expressed intent." Perry, 95 F.3d at 236.
Additionally, the Court "must exhibit particular deference to the
[agency's] position with respect to legislation as intricate as
Medicaid." Id.

Plaintiff argues that CMS's approval of the Plan was not a
permissible construction of the Medicaid statute because neither
CMS nor defendant considered the actual costs of the FQHCs, as

intended by Congress and mandated in an agency directive sent to
the states in 1995 (the "Richardson letter"), and thus CMS did
not actually make any determination as to whether Connecticut's
productivity screen complied with the statute.  Plaintiff points
to the deposition testimony of CMS Boston employee Richard
Pecorella and a letter sent by CMS Boston to the Connecticut
Primary Care Association, explaining CMS's rationale in approving
the Plan, and claims "CMS Regional Office made no
'interpretation' of the Medicaid statute when it approved the
Connecticut State Plan amendment containing the 4,200 physician
productivity screen.  That Office approved the amendment because
of its silly notion that CMS policy required it to accept
whatever payment methodology was in place immediately prior to
the PPS legislation as the methodology to be applied in
calculating reasonable costs under new PPS law."  Pl. Reply [Doc.
# 53] at 2.  Plaintiff contends that CMS's review and approval
was focused solely on bringing Connecticut into compliance with
the Medicaid statute where Connecticut's payment methodologies
since 1996, pursuant to Connecticut statute, had included the
4,200 productivity screen, but Connecticut had not amended its
Plan to reflect that particular productivity screen until 2001.

Defendant responds that the HHS Secretary delegated to CMS
the authority to establish tests, including screening guidelines,
for determining reasonable costs for purposes of Medicare

reimbursement and that, in exercise of that authority, CMS uses a productivity screen for Medicare.  Defendant contends that it was reasonable for CMS to implement the screen for Medicare, even after the Health Resources and Services Administration ("HRSA") discontinued use of it for its grant programs, and argues that there is no basis from which to conclude that CMS required Connecticut to demonstrate the reasonableness of CMS's own Medicare productivity standard in order to use it in its Medicaid system.  Defendant further urges that CMS's approval of Connecticut's Plan was permissible because Pecorella assumed the screen was reasonable since it was also used by CMS for Medicare.

The relevant Medicaid provision of BIPA provides that FQHCs must be reimbursed:

> in an amount (calculated on a per visit basis) that is equal to 100 percent of the average of the costs of the center or clinic of furnishing such services during fiscal years 1999 and 2000 <u>which are reasonable and related to the cost of furnishing such services</u>, or <u>based on such other tests of reasonableness</u> as the Secretary prescribed in regulations under [Medicare], or, in the case of services to which such regulations do not apply, the same methodology used under [Medicare], adjusted to take into account any increase or decrease in the scope of such services furnished by the center or clinic during fiscal year 2001.

42 U.S.C. § 1396a(bb)(2).  In response to BIPA's enactment, in January 2001, HHS directed state Medicaid directors to "submit conforming State plan amendments before the end of the first calendar quarter."  Richter Aff. Attachment 1.  Accordingly, DSS submitted to CMS Boston a proposed Plan amendment which included

14

the 4,200 physician visit per year productivity screen used by CMS for Medicare.  This amendment reflected the payment methodology used by DSS for Medicaid rate determinations since the enactment of Conn. Gen. Stat. § 17b-245a in 1996, which provides that "in the determination of rates for [FQHCs], the Commission of Social Services shall apply Medicare productivity standards."

The 4,200 productivity screen has a long history within various federally-funded medical services programs.  In 1978, CMS's predecessor HCFA established screening guidelines for Medicare and Medicaid reimbursement to Rural Health Clinics ("RHCs").  43 Fed. Reg. 42,787, 24,788 (Sept. 21, 1978); Worgo Aff. [Doc. # 44, Ex. E] ¶¶ 7-8.  HCFA explained that these productivity guidelines were "comparable with those used in connection with reimbursement for similar services furnished by federally funded health centers. . . . Experience has shown them to be fair and workable."  43 Fed. Reg. 42,787, 24,788.  CMS's David Worgo testified that as a precursor to adopting these RHC productivity guidelines, CMS analyzed clinic data to determine whether the guidelines were reasonable.  Worgo Dep. [Doc. # 44, Ex. F] 92-93.  In 1980, HCFA proposed a productivity screen of 4,200 physician visits per year for RHC reimbursement, see 45 Fed. Reg. 59,734, 59,740 (Sept. 10, 1980), which was adopted from a screen used by HRSA for its grant-funded health centers, see

Worgo Aff. ¶¶ 10-11.  HCFA noted that it "believe[d] the proposed guidelines [were] reasonable because they [we]re very close to [its] estimates of the actual average productivity of clinics [then] reporting their costs and utilization to HCFA."  45 Fed. Reg. 59,734, 59,740.  The final revised productivity screens for RHCs were issued on December 1, 1982.  47 Fed. Reg. 54,163, 54,165 (Dec. 1, 1982).

Then, in 1990, Congress added FQHCs to the definition of "medical and other health services" offered under the Medicare program, as provided in the Social Security Act.  42 U.S.C. § 1395x(s)(2)(E).  In 1992, HCFA issued for comment a rule concerning Medicare reimbursement to FQHCs which provided that it was adopting the RHC payment methodology for FQHCs, including the 4,200 productivity screen.  57 Fed. Reg. 24,967, 24,967 (June 12, 1992).  Before HCFA issued its final rule concerning Medicare reimbursement to FQHCs, however, HCFA learned that HSRA was discontinuing use of the 4,200 physician visit screen for its centers, <u>see</u> Def. L.R. 56a(1) Stmt. [Doc. # 44] ¶ 32, but HCFA nevertheless kept the screen in its proposed rule, purportedly because: "(1) HCFA had made a specific determination that the screens were reasonable and effective, based on data from the clinics; (2) clinics or centers could request a waiver of the screens; and (3) there were no reported waiver requests by FQHCs in the previous several years."  <u>Id</u>. ¶ 33 (citing Worgo Aff. ¶

16

18; Worgo Dep. 91-93).  In 1996, HCFA issued its final rule
regarding FQHC Medicare reimbursement, including the 4,200
screen.  61 Fed. Reg. 14,640, 14,656 (Apr. 3, 1996).  It is this
Medicare productivity screen that Conn. Gen. Stat. § 17b-245a
required DSS to apply, beginning in 1996, to payment
determinations for Medicaid reimbursement to FQHCs.

Thus, while CMS conducted a survey prior to adopting a
productivity screen in 1978 for services provided by RHCs, it
never updated this survey in making its determination in the
1990s to use the 4,200 screen for Medicare services provided by
FQHCs, even after HSRA, the entity from which CMS had adopted the
screen, stopped using it.  Additionally, while Worgo now claims
that CMS continued to use the screen after HRSA's abandonment
based on its own 1978 survey and due to the existence of a waiver
provision, see Worgo Dep. at 91, such explanations were not
articulated in the 1996 rule; indeed, in the final rule CMS
included a response to a comment questioning the appropriateness
of the productivity screens, stating "[w]e use the same
guidelines applied by HRSA. . . . We believe it is appropriate to
use uniform productivity guidelines rather than developing
separate guidelines."  61 Fed. Reg. 14,640, 14,651.  CMS also
failed to offer any explanation of why its 1978 data for RHCs was
instructive as to whether the screen would account for the
reasonable costs of FQHCs more than ten years later.

17

Against this backdrop, when DSS submitted its amended Medicaid Plan to CMS in 2001, which included the 4,200 productivity screen, CMS approved it.  See Approval Letter [Doc. # 44, Ex. A, Attachment 5].  CMS's Richard Pecorella testified that he was primarily concerned with ensuring Connecticut was in compliance with the Medicaid statute by approving a Plan that reflected Connecticut's actual Medicaid payment methodologies (as implemented by Conn. Gen. Stat. ¶ 17b-245a in 1996).  See Pecorella Dep. 39.[6]  "[T]he basic principle that CMS was operating on, was the state will use the methodology it had in place in '99 and 2000, which is the years you use to calculate your base year. . . . So [Connecticut] had the 4200 in there. That was their definition of reasonableness."  Id. 20-21. Pecorella also testified that he considered Connecticut's productivity screen to be reasonable because it was based on CMS's own screen for Medicare reimbursement and was in the State Medicaid Manual.  Id. 22-23, 34-35 ("[T]his particular standard screen . . . was essentially being imposed on Medicare payment to [FQHCs], there is a basic assumption that it's reasonable. . . .

_____

[6] "Q. . . . I guess I'm trying to get at, and see if you agree is that the substance of whether the 4200 number was reasonable was not considered.  The real issue that you were wrestling with was the failure of the state to amend its plan and getting the state to amend its plan and bring itself into full compliance; is that a correct statement?  A.  That's a fair assessment of what went on.  There was no question of reasonableness.  There was a question of process, and the mistakes the state made."

I mean, I would have to say that my agency is wrong before I said to the state that they're wrong."). Thus, Pecorella did not substantively evaluate whether CMS's use of the screen for Medicare and/or Connecticut's inclusion of that screen in its Medicaid plan were statutorily permissible actions. Indeed, Pecorella admitted that he did not examine FQHC reasonable costs and that no one at CMS conducted an audit to determine if FQHCs are sufficiently reimbursed. Id. 14, 50-51. Rather, Pecorella believed such an assessment was not necessary, and that the reasonableness of the productivity screen could be presumed, because it was already used by CMS in the Medicare context.

Thus, as detailed above, CMS's predecessor HCFA never assessed whether the 4,200 productivity screen accounted for "reasonable and related" costs of FQHCs when it adopted the screen in the Medicare context in 1996, even after HSRA had abandoned the screen for its federally-funded programs; CMS did not examine "reasonable and related" costs of FQHCs in the Medicaid context when it approved Connecticut's amended plan which incorporated the screen (nor did it articulate the similarities between Medicare and Medicaid services to justify use of CMS's Medicare screen in a State Medicaid plan[7]); and

---

[7] "The Medicare statute authorizes the Secretary to define 'reasonable' as he chooses. It does not follow, however, that the Secretary's definition of 'reasonable' or 'reasonable and related' under Medicare necessarily also defines those terms for Medicaid purposes." Community Health Ctr., 311 F.3d at 137.

Connecticut itself made no assessment of "reasonable and related" FQHC costs when it amended its plan, rather it just amended its plan to include CMS's Medicare screen as mandated by State statute.

In its decision on appeal, the Second Circuit counseled that deference may be particularly appropriate "where a highly expert agency administers a large and complex regulatory scheme in cooperation with many other institutional actors," and that "[w]e take care not lightly to disrupt the informed judgments of those who must labor daily in the minefield of often arcane policy, especially given the substantive complexities of the Medicaid statute." 311 F.3d at 138. However, in this case, there simply was no exercise of such agency expertise: at no point did CMS actually evaluate whether the 4,200 screen as applied to FQHCs complies with the Medicaid statute (or the Medicare statute, for that matter). This is thus one of the rare cases to which the Second Circuit's caution that "[d]eference . . . even at its highest levels, is not a rubber stamp," id. at 140, applies. Because CMS never engaged in any interpretation as to whether the 4,200 productivity screen passes statutory muster,[8] either in adopting the productivity screen in the Medicare context or in

---

[8] In reaching its conclusions, the Court notes that CMS declined to intervene in this action before this Court prior to appeal, filed an amicus brief before the Second Circuit, and has not filed any amicus assistance to the Court on remand.

approving Connecticut's use of the screen in the Medicaid context, there is nothing for the Court to defer to.

## IV.  Conclusion

In conclusion, the Court finds that CMS's approval of Connecticut's Plan is not entitled to deference and thus DSS cannot rely on that approval as grounds for its compliance with BIPA for purposes of FQHC reimbursement, particularly where CMS failed to articulate an explanation for use and approval of the 4,200 screen even after HRSA discontinued its use of that screen. The case will therefore move to the second phase to determine what DSS itself did to ensure its Plan's compliance with BIPA's mandate.

Accordingly, plaintiff's Motion for Summary Judgment [Doc. # 45] is GRANTED, and defendant's Motion for Summary Judgment [Doc. # 42] is DENIED.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton
United States District Judge

**Dated at New Haven, Connecticut this 1st day of September, 2006.**